FINK and another, Respondents, vs. LA CROSSE MUTUAL FIRE INSURANCE COMPANY, Appellant.

FINK and another, Respondents, vs. SHEBOYGAN FALLS MUTUAL FIRE INSURANCE COMPANY, Appellant.

*December 12, 1930—January 13, 1931.*

For the appellants there was a brief by *Richmond, Jackman, Wilkie & Toebaas* of Madison and *Casey & McGee* of Ellsworth, and oral argument by *Harold M. Wilkie*.

*W. G. Haddow* of Ellsworth, for the respondents.

WICKHEM, J. The policies in question contained the following provision, which is required under the standard fire insurance policy law of Wisconsin:

"This entire policy shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

This court has held in *F. Dohmen Co. v. Niagara Fire Ins. Co.* 96 Wis. 38, 71 N. W. 69:

"Any trick, artifice, or deception practiced with the object of securing some advantage in the adjustment or pay-

ment of a loss under a policy of insurance, to the prejudice of the insurer, and liable to have that effect, avoids the policy." This follows "regardless of the fact whether damages actually resulted to the insurance company." *Bannon v. Insurance Co. of North America,* 115 Wis. 250, 91 N. W. 666.

It is also held that the clause above quoted is highly penal; that it is not merely aimed at protecting the insurer against fraud, but imposes upon the insured, as a penalty, forfeiture of the whole insurance, although the fraud might affect some trifling portion of it. Consequently, more has been required to constitute such fraud or false swearing as will avoid the policy than will justify an action for rescission or damages for fraud. "It is held by an unbroken line of decisions in this court that this penalty is not to fall unless the false swearing is knowingly and wilfully done. It is not enough that it occurs through mistake, carelessness, or inadvertence, or even in unreasonable reliance on information derived from others." *Beyer v. St. Paul F. & M. Ins. Co.* 112 Wis. 138, 88 N. W. 57. See, also, *Meyer v. Home Ins. Co.* 127 Wis. 293, 106 N. W. 1087; *Wiesman v. American Ins. Co.* 184 Wis. 523, 199 N. W. 55, 200 N. W. 304; *Oberleitner v. Security Ins. Co.* 199 Wis. 220, 225 N. W. 735.

The question in this case is whether the insured has been guilty of knowingly and wilfully misrepresenting facts or false swearing in any manner touching the insurance, with intent to mislead the insurer. The evidence is quite voluminous and difficult to present within any reasonable limits. A brief review of some of the facts with respect to the insured's conduct may be sufficient to make our conclusions understandable.

In the proofs of loss there were included two tractors— one Model H La Crosse tractor, value at time of fire $875, and one Model F La Crosse tractor, value $575. On the adverse examination Fink testified that these were brand

new tractors, bought from the La Crosse Tractor Company in the fall of 1927; that the numbers of these tractors were correctly shown on a typewritten list which Fink produced on this examination, and which constituted a list of articles that plaintiff claimed were in the fire but were not mortgaged. In this list the number of the Model H tractor appeared in ink as No. 19433, and the other tractor was described as Model A La Crosse tractor No. 14847, of the value of $575. This typewritten list contained no Model F tractor at all. In his adverse examination Fink testified that in the fall of 1927 he bought three tractors from the La Crosse Tractor Company; that two of these were Model H and one Model A. He stated that he thought he had invoices for these, and that he paid the La Crosse Tractor Company $875 for the Model H tractor, part in cash and part by note. He stated that two of these tractors were in the fire and that they were burned, and that the serial numbers were still on the tractors. After the adverse examination defendants' attorneys made some inquiries of the La Crosse Tractor Company but received no reply. The manager, however, did write to Fink stating that while he did not know what tractors were in the fire, he knew that the tractors that were listed by numbers were never in the fire because there never were any such serial numbers for those models. Plaintiff, upon receipt of this letter, immediately phoned the manager of the La Crosse Company and told him it would not be necessary to answer counsel's letter of inquiry because the case had been settled. Thereafter counsel for defendants had a conference with the manager of the Tractor Company, and the manager thereafter wrote plaintiff calling his attention to the fact that the price—$850 less twenty per cent.—was incorrect for tractors shipped to Fink for the past five years or more. At the trial Fink would not admit whether or not he had received such letters from the manager, but after the copies were put in

evidence he did implicitly admit that he had received them, but that he had been advised by his attorney to ask the manager not to give the information to counsel. His attorney at that time was Mr. Waller, who later testified in the case that he never gave such advice to Fink. Later on in the trial Fink testified that he did not tell Hurt to keep back the information. Hurt, the manager of the Tractor Company, testified that the Model A tractor was one of the first models manufactured by their company, and that the last of that model was manufactured in 1917. He testified that they never manufactured a Model A tractor of the serial number given by the plaintiff, nor a Model H or Model G tractor of the number given by the plaintiff. He testified that the only tractors sold to Fink in 1927 were recalled and never unloaded from the freight cars. He further testified that the invoice price of these tractors was $450 each. On the trial Fink testified that he had been in the business of selling tractors for fourteen years, and was familiar with the prices of such equipment; that in some cases the amounts put down in the proofs of loss were too high, for the reason that they were subject to a dealer's discount of twenty per cent. He testified that with that deduction of twenty per cent. the amounts were "cash I paid for them." He then testified that the La Crosse tractors were not bought from the La Crosse Tractor Company, but that one was shipped by a dealer in South Dakota and the other by an automobile company in Minneapolis. Both vendors were out of business at the time of the trial. His attention was called to the inconsistency with respect to where he bought these tractors, and he accounts for that by stating that when he came to look up the record it showed that "they come from the parties I just told you." He was asked where the record was and he said, "I suppose it is down to the house." After being asked to produce it, he said he did not have it. On being asked where he got the record at his house he said he

couldn't say. Asked if he had seen the record he said, "Not myself, no." He said his wife took care of that; that she had inspected it. He was asked if she told him about it. He said, "She didn't tell me about it; we just fixed it up and fixed the answer up." Later on in the trial, after a recess, he was asked if he now had that record and he said "that was taken out of an old ledger." He was asked if he had it with him and he said he did not have it—didn't look for it at all.

One of the items listed in the proofs of loss was one sugar jack, $320. In the adverse examination Fink testified that he got the sugar jack in September, 1927, from the United Engine Company at Minneapolis. He testified further that this was the only sugar jack he had bought in 1927, and that he had ordered it for a customer who finally decided to take a feed mill in place of it. He also stated that $320 was the list price for this sugar jack, and represented cash that he actually paid for it. At the trial he admitted that the jack was bought in 1924; that he had sold this sugar jack to a man named Pelsel in 1924, who had used it for three seasons and who then traded it back to Fink on a tractor deal. He accounted for this by saying that he had allowed Pelsel the full price on the tractor and considered that that represented a cash outlay of $320.

Plaintiff also listed one 15 H. P. Wollery engine, $350. On adverse examination he testified that this machine sold for $475; that $350 was the net price he paid for it; that he had had it about two years, and that it was new, having merely been used for demonstration purposes. The facts, as clearly shown at the trial, were that the engine had been sold by the manufacturer to one Skog, who had used it from 1921 to 1925 for "everything, silo filling, corn shredding, and cutting wood." In 1925 he traded this engine to Fink for a used tractor. The engine had received hard usage and he was allowed $168 for it by Fink. Fink later

admitted that he got this engine from Skog, and claims he bought it as a new engine. He then testified that it had been entirely rebuilt and that he had allowed $350 for it.

We find it impossible, after a careful reading of the record in this case, to avoid the conclusion that respondent knowingly and wilfully misrepresented material facts with the intention to deceive the insurer. The decision of the learned trial judge indicates that while insured has been guilty of misrepresentations, the court is not satisfied that there was any intention or purpose on his part to deceive the insurer. We do not believe there is room for such an inference upon the testimony. It is indicated in several Wisconsin decisions that "in addition to the knowledge and purpose to falsify, there must be an intent to mislead the company, to induce it to act to its injury otherwise than it would if informed of the truth." *Beyer v. St. Paul F. & M. Ins. Co.* 112 Wis. 138, 143, 88 N. W. 57, citing *Dogge v. Northwestern Nat. Ins. Co.* 49 Wis. 501, 504, 5 N. W. 889; *Cayon v. Dwelling House Ins. Co.* 68 Wis. 510, 515, 32 N. W. 540; *F. Dohmen Co. v. Niagara F. Ins. Co.* 96 Wis. 38, 55, 71 N. W. 69; *Gettelman v. Commercial Union Assur. Co.* 97 Wis. 237, 72 N. W. 627. However, it is well established that where a representation is made with knowledge of its falsity and with intent that it shall be acted upon, the necessary fraudulent intent will be inferred. We find nothing in the record that would in any way put an innocent interpretation upon the conduct of the insured. The false statements were made upon the adverse examination, were intended to be the basis of a settlement, and the adverse examination actually was the basis for an offer of settlement made by the defendant companies.

In *Bannon v. Insurance Co. of North America,* 115 Wis. 250, 91 N. W. 666, the court said:

"The intentional falsification of books or statements showing a greater amount of property on hand than the

fact was, and submission of such books or statements to the adjusters as correct, fulfils every requirement of the condition avoiding the policy, regardless of the fact whether damages actually resulted to the insurance company. Such an act is manifestly liable to deceive the insurer and cause him to pay more than he in justice ought to pay, and the only questions left for the jury are whether it was done, and, if so, whether it was intentionally and wilfully done."

It is our conclusion that for the foregoing reasons the judgments of the circuit court must be reversed.

*By the Court.*—Judgments reversed, and causes remanded with directions to dismiss the complaint in each.